## Erb v. Stoner

*John L. Hamaker*, for appellant.

*Barley, Snyder, Cooper & Mueller*, for appellee.

WISSLER, P. J., March 20, 1959.—The matter before the court is an appeal from the award of arbitrators in favor of plaintiff, C. S. Erb, and against defendant, Paul Stoner.

The facts and legal question involved are set forth in a stipulation filed on February 14, 1959, by counsel for plaintiff and defendant which is as follows:

"And now, February 14, 1959, it is hereby agreed by and between the parties to the above stated action that the following case be stated for the opinion of the Court in the nature of a special verdict."

### Facts

Plaintiff, C. S. Erb, is in the business of raising and selling registered Holstein cows, and resides at R. D. 1, Middletown, Dauphin County. Defendant, Paul Stoner, also known as Paul S. Stoner, trades as Farmers Market & Auction at R. D. 3, Ephrata, Lancaster County.

On October 10, 1955, and February 4, 1956, plaintiff, through purchase money security agreements, sold six registered Holstein cows to one R. H. Neel, of Chester County. These security agreements provided for the payment in installments of the unpaid purchase money for the cows, were filed as required by the Uniform Commercial Code, and each contained the following provision:

"8. That the Debtor hereby gives to the Secured Party a security interest in any offspring of the said Cattle, or in any Cattle subsequently acquired by the Debtor, as either replacements, or additions."

Debtor, R. H. Neel, while in default of the terms of the security agreements, on or about November 1, 1957, delivered his herd of 16 cows to defendant for sale by auction. Included in these 16 cows were three cows covered by the security agreements and it is admitted that the fair market value of these three cows was $1,350. The remaining 13 cows delivered by Neel to the defendant were acquired by Neel subsequent to October 10, 1955, but were not specifically included in either of the security agreements.

While the 16 cows were in the possession of defendant, and before any of them were sold at auction, defendant had personal notice of plaintiff's interests in the three cows specifically mentioned in the security agreements and the interests which plaintiff claimed in the remaining 13 cows under the above stated provision of the security agreement. Defendant sold or disposed of all of the 16 cows on or about November 8, 1957, and the net proceeds therefrom were $2,776.92. While said proceeds were still in the possession of defendant, plaintiff notified defendant that the balance due him from the debtor, Neel, was $1,435.22, and plaintiff demanded that defendant pay him said sum.

Defendant disbursed the net proceeds above mentioned, but gave none of them to plaintiff, and thereafter plaintiff instituted this action in trespass, in the nature of trover and conversion, against defendant claiming that defendant owed plaintiff the unpaid balance of $1,435.22 due under the aforesaid security agreements, and attorney's fee of 10 percent, amounting to $143.25, all other legal costs and interest at the rate of six percent on the unpaid balance. The total of plaintiff's claim, as stated in the complaint was $1,-578.74, plus interest from November 8, 1957, and legal costs.

The question thus raised is, since the fair market value of the three cows specifically covered by the security agreements is less than the total amount claimed by

plaintiff, whether or not plaintiff is entitled to such additional sum because of the provisions of the security agreements quoted above.

If the court be of the opinion that the provisions of the security agreements gave plaintiff a security interest in the remaining 13 cows, then judgment should be entered for plaintiff for the full amount of plaintiff's claim; but if not, then judgment should be entered for plaintiff only for the fair market value of the three cows specifically mentioned in the security agreements, together with such attorney fee, legal costs and interest as the court may deem that plaintiff is entitled to.

Consisely stated the stipulation filed presents the following question: Since the fair market value of the three cows specifically covered by the security agreements is less than the total amount claimed by plaintiff, is he, nevertheless, entitled to receive from defendant the entire amount of his claim because of the after-acquired property clause in each security agreement.

The security agreements of plaintiff contained the following provision: "That the Debtor hereby gives to the Secured Party a security interest in any offspring of the said Cattle, or in any Cattle subsequently acquired by the Debtor, as either replacements, or additions." Plaintiff's right of recovery for the full amount claimed depends upon the construction of the Uniform Commercial Code of April 6, 1953, P. L. 3, sec. 9-204, subsec. 3, 12A PS §9-204, which provides as follows: "Except as provided in subsection (4) a security agreement may provide that collateral, whenever acquired, shall secure any advances made or other value given at any time pursuant to the security agreement." Defendant does not question the validity of the security agreements and their perfection by proper filing and admits that he had knowledge of plaintiff's security interest in the cows listed in the security agreements, which were included in the 16 cows delivered by the

debtor to defendant for sale by auction and that he had personal notice of plaintiff's claim before the sale of same.

It is the contention of defendant that section 9-204, subsec. 3, must be construed with reference to section 9-108, subsec. 2, 12A PS §9-108, which provides as follows: "Where a secured party makes an advance, incurs an obligation or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for such new value and not as security for a preëxisting claim if the debtor acquires his rights in such collateral either in the ordinary course of his business. . . ." The question thus raised is whether the words "any advances made or other value given at any time pursuant to the security agreement" as used in subsection 3 of section 9-204, mean the original value given by the security party to the debtor at the time of the original transaction or do they refer to transactions between the parties subsequent thereto.

Paragraph 3 of the Uniform Commercial Code, Comment on section 9-108, 12A PS §9-108, comment, par. 3, states: "Many financing transactions contemplate that the secured party will be secured not only by the debtor's existing assets but by assets thereafter acquired by him in the operation of his business. This Article generally validates such after-acquired property interests (see Section 9-204 and Comment) although they may be subordinated to later purchase money interests under Section 9-312(4).

"Interests in after-acquired property have never been considered, nor should they be considered, as involving, merely because of the after-acquired feature, transfers of property for antecedent debt. Subsection (2) makes explicit what has been true under the case law; an after-acquired property interest is not, by

virtue of that fact alone, security for a preëxisting claim. This rule is of importance principally in insolvency proceedings under the federal Bankruptcy Act or State statutes which make certain transfers for antecedent debt voidable as preferences."

It would, therefore, seem that section 9-108 relating to new value is of importance primarily in insolvency proceedings under Federal bankruptcy law or State statutes making certain transfers for antecedent debt voidable as preferences and therefore not irreconcilable with section 9-204, subsec. 3. Even if it were considered irreconcilable, section 9-204, subsec. 3, being the clause last in order of date or position, would have to prevail under the Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 64, 46 PS §564.

The Uniform Commercial Code of April 6, 1953, P. L. 3, sec. 1-102, in reference to purposes of the act and rules of construction, provides: "(1) This Act shall be liberally construed and applied to promote its underlying purposes and policies.

"(2) Underlying purposes and policies of this Act are:

"(a) To simplify and modernize and develop greater precision and certainty in the rules of law governing commercial transactions;

"(b) to preserve flexibility in commercial transactions and to encourage continued expansion of commercial practices and mechanisms through custom, usage and agreement of the parties;

"(c) to make uniform the law among the various jurisdictions": 12A PS §1-102.

The Uniform Commercial Code Comment to sec. 9-204, 12A PS §9-204 Comment, states: "This Article rejects the doctrine—of which the judicial attitude toward after-acquired property interests was one expression—that there is reason to invalidate as a matter of law what has been variously called the floating

charge, the free-handed mortgage and the lien on a shifting stock. This Article validates a security interest in the debtor's existing and future assets, even though (see Section 9-205) the debtor has liberty to use or dispose of collateral without being required to account for proceeds or substitute new collateral."

Considering that the stated purpose of the act was to preserve flexibility in commercial transactions and to encourage expansion of commercial practices so as to facilitate the free flow of credit, the court, especially in view of the fact that in the case at bar there is no conflicting purchase money security in the same collateral, has no difficulty in finding section 9-108 reconcilable with section 9-204 of the Uniform Commercial Code.

And now, March 20, 1959, for the foregoing reasons the court enters judgment in favor of plaintiff, C. S. Erb, and against Paul Stoner, defendant, for $1,435.-22, being the unpaid balance, together with an attorney's fee of 10 percent, plus interest at the rate of six percent on the unpaid balance from November 8, 1957, and legal costs.